IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

TOLEDO ELECTRICAL WELFARE FUND,

                       Plaintiff,                  Case No. 3:04 CV 7722

    -vs-

                                            <u>MEMORANDUM   OPINION</u>

N. W. OHIO BUCKEYE ELECTRIC,
LTD., et al.,

                       Defendant.

KATZ, J.

This matter is before the Court on motions for summary judgment filed by the plaintiff (Doc. 162), the defendants (Doc. 160), and the third-party defendants (Doc. 156). This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**I. Background**

This case involves a variety of claims brought by three parties: Plaintiff, the Toledo Electrical Welfare Fund ("TEWF" or "the Fund"); Defendant/Third-Party Plaintiffs, N. W. Ohio Buckeye Electric, Ltd. ("NWO"), Jamie Sorosiak, Kelly Sorosiak, and K.S. Buckeye Maintenance, LLC ("KSB"); and Third-Party Defendants, the International Brotherhood of Electrical Workers, Local Union No. 8 ("Local 8" or "Union"), Dennis Duffey, Local 8's Business Manager, and Kenneth Roach, Local 8's Business Agent.

N.W. Ohio Buckeye Electric, Ltd. [NWO] was formed in early 2002 by Jamie Sorosiak to perform basic residential electric work. At the time of its formation, Mr. Sorosiak was NWO's sole employee. Shortly after NWO's formation, Mr. Sorosiak began to employ students from Penta Career Center Vocational High School [Penta] to assist in performing work for NWO. The

part-time work performed by the students was completed under an arrangement between NWO and Penta, wherein the students would alternate working for NWO for a week, and attending classes at Penta for the next week.  The parents of the Penta Career Center students enrolled in the school-to-work program had to sign permission slips in order for those students to work for NWO because the students were under the age of eighteen.

On December 16, 2002, Mr. Sorosiak signed two letters of assent ("LOAs") with the Union.  There are two types of collective bargaining agreements involved in this case. The first is a "Residential Agreement between Toledo Electrical Contractors Association, Inc. and Local Union No. 8, I.B.E.W." ("Residential CBA"). The Residential CBA governs residential electrical work performed by signatories.  The second is an "Inside Agreement Between National Electrical Contractors Association, Ohio/Michigan Chapter and International Brotherhood of Electrical Workers Local Union No. 8" ("Inside CBA"). The Inside CBA agreement governs commercial electrical work performed by signatories. Since June 26, 2000, two residential agreements have been executed. The first was effective between June 26, 2000 and May 25, 2003 (Ladd Aff., ¶3, Ex. A), and the second was effective between June 23, 2003 and May 25, 2008 (Ladd Aff., ¶4, Ex. B). Since May 27, 2002, two inside agreements have been executed. The first was effective between May 27, 2002 and April 24, 2005 (Ladd Aff., ¶5, Exhibit C) and the second is effective between April 25, 2005 and April 27, 2008 (Ladd Aff., ¶6, Exhibit D).

In exchange for the Union's provision of employees, benefits, and other services, Mr. Sorosiak bound NWO to "comply with, and be bound by, all of the provisions contained in said current and subsequent approved labor agreements." (Doc. 119, p. 7, ¶32; J. Sorosiak Depo. I, Ex. B, Resp. to Request to Admit No. 6.)  Further, the Letters of Assent remained in effect "until

2

terminated by the undersigned employer giving written notice to the Toledo Chapter, NECA (Toledo Electrical Contractors Association, Inc.) and the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the applicable labor agreement." (J. Sorosiak Depo. I, Exs. D and E.)

Jamie testified that, at the December 16, 2002 meeting, he asked and was told by Duffey and Roach that if he signed the Letters of Assent with the Union, he would not have to pay fringes on himself, because he was the owner of the company, nor would he have to pay fringes, union dues or make fringe benefit contributions for the Penta Career Center school-to-work students who currently worked for him. (Jamie Sorosiak July 19, 2006 Depo. at 36, 107, and 124.) Jamie was told that under the terms of the agreement, he would only have to hire one journeyman electrician from the Union hall and pay full benefits on him. (Jamie Sorosiak July 19, 2006 Depo. at 107.) Jamie was also told by Duffey that he would also have to post a $3,000 fringe benefit bond for the one man sent from the union hall. (Jamie Sorosiak July 19, 2006 Depo. at 109.)

Roach testified that he and Jamie casually spoke for 15 to 20 minutes about Union membership and Roach told Jamie he would have to sign a Letter of Assent, have a Federal I.D. number, workers' compensation insurance, and must post a wage and fringe benefit bond to become a signatory contractor. (Roach Depo. at 9.) Roach claims nothing further was discussed at this meeting. *Id.* Jamie testified that the representations made to him in a December 2002 meeting were the same representations that Roach and Duffey had previously made to him and his wife in the June 2002 meeting with the Union. (Jamie Sorosiak July 19, 2006 Depo. at 36.) Jamie testified that he was specifically told by Duffey and Roach that the Penta Career Center high school students he currently employed could not be members of the Union until they graduated

3

from high school and could be enrolled in Local 8's Residential Trainee Program in September of 2003. (Jamie Sorosiak July 19, 2006 Depo. at 55-56 and 127; August 15, 2006 Depo. at 31-32, and 34.) Jamie provided Duffey with the names of the Penta County students who currently worked for him and testified that Duffey wrote them down. (Jamie Sorosiak July 19, 2006 Depo. at 55-56.) Jamie was told by Roach and Duffey that their Residential Trainee classes were currently full and they would contact him when it was time to enroll, in the fall of 2003. (Jamie Sorosiak July 19, 2006 Depo. at 56 and 65.) Jamie testified that he was never informed by Duffey that anything else was needed to register the students with the Union or with the JATC program. (Jamie Sorosiak July 19, 2006 Depo. at 120.) None of the Penta Career Center vocational students, or Jamie were required to join the Union or fill out any other forms. (Jamie Sorosiak July 19, 2006 Depo. at 224; see also Exhibit R.)  Jamie signed two Letters of Assent adopting the terms and conditions of the Union's Inside and Residential CBAs.  Jamie testified, if Duffey and Roach had "told me I had to pay on myself we [NWO] couldn't afford it, I never would have signed signatory with them," (Jamie Sorosiak July 19, 2006 Depo. at 61) that he did not know what an LOA or CBA was, and that he did not read the LOAs or CBAs. Roach testified that he met again with Jamie, Kelly, and Duffey in December 2002 when Jamie signed the LOAs. (Roach Depo. at 10-11.)  Roach recalled Duffey explicitly telling Jamie that if Jamie wanted to work with the tools, he must employ at least eight guys, or else Jamie had to pay fringes on himself if he worked with the tools.  (Roach Depo. at 18-19.)

By signing the Letters of Assent, Mr. Sorosiak agreed to hire out of the Union hall, contribute to the Funds, and post a bond. (J. Sorosiak Depo. I., p. 120; J. Sorosiak Resp. to Req. To Admit Nos. 2, 3, attached as Tab 1.)  Mr. Sorosiak then hired Jeremy Harloff, a member of

Local 8, to perform covered work pursuant to the Labor Agreements. N.W. Ohio Buckeye

submitted payroll reports in February, March, April, May, June, and July of 2003 and paid

contributions for January through June for Jeremy Harloff. (J. Sorosiak Depo. I, p. 121, Ex. F.)

Mr. Sorosiak directly hired Mike Lambert who began working for NWO on January 9, 2003.

Mike Lambert was not a student at the time he was hired (J. Sorosiak Depo. I, p. 60)  Mr. Sorosiak

never reported Mike Lambert on his contribution forms or paid contributions for him. (J. Sorosiak

Depo. I, p. 121, Ex. F.)  During the same period of time NWO employed Jeremy Harloff and Mike

Lambert, NWO also employed Brand Ebner, Carson Lucas, and Ryan Moll. NWO, however,

never reported these employees on its contribution forms or paid contributions for them.  On June

10, 2003, NWO laid off Jeremy Harloff and continued to employ the other workers for the

remainder of 2003.

In the first week of June of 2003, six months after signing the Letters of Assent with the

Union, Jamie found he could no longer afford to pay the fringe benefits on behalf of Jeremy

Harloff, the only bargaining unit member he employed, and continue to stay in business. (Jamie

Sorosiak July 19, 2006 Depo. at 58-59.) Jamie decided to lay-off Harloff and sent him back to the

Union. *Id*.  As it was, Jamie testified he rarely if ever received a paycheck from NWO. (Jamie

Sorosiak July 19, 2006 Depo. at 35.) Immediately after sending Harloff back to the Union hiring

hall, Jamie went to the Union offices in person and met with Kenneth Roach. (Jamie Sorosiak July

19, 2006 Depo. at 109-110 and 117; August 16, 2006 Depo. at 58 and 108.) Jamie testified that he

told Roach that NWO was terminating its agreements with the Union, and that Roach stated to

Jamie, "I am sorry to hear that, man," and that was the end of the conversation. (Jamie Sorosiak

July 19, 2006 Depo. at117; August 16, 2006 Depo. at 109.)  At that time, Jamie claims to have

5

employed only Penta Career Center school-to-work students, and that Mike Lambert, unbeknownst to Jamie, had recently graduated from high school and was not able to enroll in the Residential Trainee Program until the fall of 2003. (Jamie Sorosiak July 19, 2006 Depo. at 110.)

Following Jamie's conversation with Roach in June of 2003, Jamie received a phone call from a woman at the health and welfare fund wanting to know why NWO had not submitted its fringe benefit contribution report for the month of July of 2003. (Jamie Sorosiak July 19, 2006 Depo. at 109; August 15, 2006 Depo. at 66.) Jamie informed the woman he had terminated his agreements with the Union and the June of 2003 fringe benefit was the last one NWO would file. *Id*. When Jamie submitted his last fringe benefit report, he had checked a box on the face of the fringe benefit report labeled "Final report in this Local Union area." (*See* June of 2003 Fringe Benefit Report, Exhibit D.)

Roach testified that in the beginning of June 2003, Jamie called him and told him that he could no longer afford Jeremy Harloff's fringe benefit package and NWO was going to lay him off. (Roach Depo. at 25.) Roach claims that Jamie never told him he was terminating the Agreements NWO had signed in December 2002. (Roach Depo. at 27.) Roach was the business agent assigned to the area where NWO was located and was responsible for enforcing NWO's compliance with Local 8's Residential CBA. (Roach Depo. at 22-23.) Following Harloff's layoff, Roach testified he did not follow-up with the work activities of anyone from NWO. (Roach Depo. at 28.)  Roach claims that Jeremy Harloff is the only person he ever knew who worked for NWO. (Roach Depo. at 58-59.)  Roach became aware in 2004 that NWO was not complying with the terms of the Residential CBA. (Roach Depo. at 28-29.) Roach stated he had collected NWO's electrical permits and given them to Todd Michaelson as evidence in support of the Labor

6

Management Committee ("LMC") grievance and arbitration award which was rendered against NWO in December of 2004.  (Roach Depo. at 30-34.) Roach testified at the LMC arbitration hearing but claims he did not sit as an arbitrator deciding the case against NWO.

Jamie Sorosiak claims to have heard nothing further from the Fund or the Union until over a year later when he received a letter from Norman Ladd, the Fund's Assistant Administrative Manager, dated August 31, 2004, claiming that NWO was still bound by the Union's Residential CBA and requested that NWO submit fringe benefit reports from July of 2003 until the present. (See Exhibit M.) In the letter, the Fund acknowledged that NWO had attempted to repudiate its agreement in June of 2003, but insisted that NWO was still bound by it. *Id.*  Mahesh Nariani, an auditor for TEWF, contacted Mr. Sorosiak to schedule an audit of NWO's books and records. (J. Sorosiak Resp. to Req. for Admission No. 5, attached as Tab 1.) When Mr. Sorosiak refused to permit the audit, TEWF filed suit on November 22, 2004. (Doc. 1.) On January 11, 2005, Mr. Sorosiak (through his former counsel) agreed to an audit, which was scheduled for January 24, 2005. (J. Sorosiak Depo. I, p. 132, Ex. G.) Another audit was scheduled for January 28, 2005.

NWO was dissolved on December 28, 2004.  KS Buckeye Maintenance LLC ("KSB") was formed on January 28, 2005. (K. Sorosiak Depo. II, p. 33, Exhibit BV.) KSB's sole member is defendant Kelly Sorosiak, Jamie Sorosiak's wife. (K. Sorosiak Depo. I, pp. 32-33.) According to Mrs. Sorosiak, KSB existed "because [Jamie and Kelly Sorosiak] were informed or I should say advised by our former attorney to dissolve Northwest Ohio Buckeye Electric and set up a new entity." (K. Sorosiak Depo. I, p. 33.)  KSB was located on the same property as NWO, used the same phone number, employed the same people, provided services to the same customers, and purchased from the same suppliers. (J. Sorosiak Depo. I, p. 152.)

7

## II. Procedural Background

On November 22, 2004, the Fund filed a fringe benefit collections case against NWO, and has since filed a nine count Second Amended Complaint, filed on February 16, 2007, alleging a claim for an order to audit (Count I), a claim for failure to make fringe benefit payments under ERISA § 515 (Count II), multiple claims alleging alter ego status and claims of joint and several liability against NWO, KSB and Jamie and Kelly Sorosiak collectively (Counts III through VII), claims for fraudulent conveyance (Count VIII), and claims for attorney's fees and punitive damages (Count IX).  In its complaint, the Fund acknowledges that NWO signed two Letters of Assent with the Union on December 16, 2002, but neither the Fund nor the Union will recognize a date when NWO effectively repudiated and/or terminated the Letters of Assent. It is the position of NWO that the Letters of Assent signed in December of 2002 were effectively terminated and/or repudiated in June of 2003.

NWO filed answers to each of the Fund's complaints.  On May 27, 2005, NWO filed a third-party complaint against the Union claiming, *inter alia,* the Union and its officials are jointly and severely liable for any fringe benefit or pension fund contributions allegedly owed to the Fund resulting from the Union's fraudulent and/or negligent misrepresentations made to NWO in connection with the signing of the two Letters of Assent on December 16, 2002.  Specifically, NWO has alleged that the Union and its officials engaged in fraud in the execution by misrepresenting the scope and nature of the Letters of Assent that NWO signed on December 16, 2002 (Counts I, V, and VI); that the Union and its officials engaged in fraud in the inducement by intentionally concealing the actual residential and inside collective bargaining agreements from NWO, and fraudulently misrepresenting that fringe benefit contributions would not be required for

8

work performed by the owner of NWO, Jamie Sorosiak, or for the Penta Career Center vocational

high students employed by NWO at the time NWO signed the Letters of Assent (Counts II, V,

VI); and that the Union and its officials are jointly and severally liable to NWO for any damages

resulting from their fraudulent, intentional and /or negligent misrepresentations to NWO (Count

VII and VIII). NWO also requested declaratory judgment from this Court finding the collective

bargaining agreement ("CBA") allegedly entered into by NWO with the Union could be

repudiated at any time and was void due to the "one man" bargaining rule doctrine (Counts III and

IV).

On September 29, 2005, the Union and its officials filed an answer to NWO's third-party

complaint and filed a counterclaim seeking to enforce an arbitration award rendered by the Labor

Management Committee ("LMC"). In its counterclaim, the Union alleged, among other things that

NWO did not properly terminate its Residential CBA in June of 2003, and further sought to

enforce the arbitration award rendered against NWO by the LMC on December 15, 2004. On

October 18, 2005, NWO filed an answer to the Local 8's counterclaim seeking to have the

arbitration award vacated.

On March 22, 2007, Local 8 filed a Rule 12(b)(6) Motion to Dismiss Counts I through VIII

of NWO's Third-Party Complaint alleging the Counts I through VIII are preempted by Section

301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185,

and/or the holding of *San Diego Building Trades Counsel v. Garmon*, 359 U.S. 236 (1959).  NWO

filed a brief in opposition and the Union filed a reply. On October 30, 2007 this Court denied

Local 8's motion to dismiss, and the Union filed an answer and counterclaim against NWO and

KSB requesting this Court to find them in breach of contract and to enforce an arbitration award

9

which was filed and decided by the LMC after this lawsuit was instituted by the Fund. Defendants

subsequently filed a timely reply to the Union's counterclaim.  Discovery has been completed in

this case and the issues presented herein are ready to be resolved by the Court by summary

judgment.

## III. Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." FED. R. CIV. P. 56(c).  The moving party bears the initial responsibility of "informing the

district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating

the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.*

at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts

showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment

cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply

[to] show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, Rule 56(e) "requires the nonmoving

party to go beyond the pleadings" and present some type of evidentiary material in support of its

position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

**IV. Discussion**

NWO claims that (1) its work as a residential contractor exempts it from making fringe benefits payments, (2) NWO effectively terminated its relationship with the Union by repudiating the LOAs and CBAs, (3) the arbitration award entered against NWO should be vacated, and (4)

11

even if NWO is liable to the Fund, the Union is responsible because it acted fraudulently with regard to the formation and enforcement of the contracts.

The Union and Fund argue that NWO lawfully entered into and did not effectively terminate the agreements, and is thus liable for unpaid contributions to the Fund. They also argue that Jamie, Kelly, NWO, and KSB are all liable because they were all essentially the same party throughout the periods in question, NWO's corporate veil must be pierced, and the defendants engaged in fraudulent transfers and concealment of funds. NWO argues that its corporate veil cannot be pierced because it was an LLC, and there was no fraudulent transfer or concealment.

### A. NWO's defenses

#### 1. Applicability of the CBAs to NWO's work

NWO was a signatory by the LOA to both the Residential and Inside CBAs. The Inside CBA contains a clause, 2.07, which states: "The employer may work with the tools if he employs no more than eight (8) electricians, provided he reports himself as a journeyman wireman and pays all the applicable fringe benefits as provided for in Section VI of this Agreement." The Residential CBA, on the other hand, does not contain an analogous clause. The Inside CBA applied by its terms to commercial contract work, while the Residential CBA applied to residential contract work. NWO performed only residential work, and did not perform commercial work. NWO's work was only subject to the Residential CBA. NWO claims that, because it did not perform any commercial work, it was not subject to the Inside CBA provision that required paying fringe benefits.

However, while there is no clause in the Residential CBA worded similarly to section 2.07 of the Inside CBA, there is language that obligates the employer to make fringe benefit contributions on behalf of employees.

> It is agreed that in accord with the National Employees Benefit Agreement entered into between the National Electrical Contractors Association and the International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the National Employees Benefit Board, the Individual Employer will forward monthly to the designated Local Secretary-Treasurer an amount equal to three percent (3%) of his gross monthly labor payroll, which he is obligated to pay to the employees in this bargaining unit, and a completed payroll report prescribed by the NEBF.
> . . .
> The individual Employer hereby accepts, and agrees to be bound by, the Restated Employees Benefit Agreement and Trust.
> . . .
> The failure of an individual Employer to comply with the applicable provisions of the Restated Employees Benefit Agreement and Trust shall also constitute a breach of his Labor Agreement.

Residential CBA § 6.01 (Article VI - Fringe Benefits).

> It is agreed between the parties hereto that Employers shall comply with all the applicable provisions of the Trust Agreement establishing the "Toledo Electrical Welfare Fund" entered into October 21, 1952. . . . Effective May 31, 1996, Employer contributions to the Toledo Electrical Welfare Fund shall be:
> Residential Journeyman $3.00 per hour for hours paid
> Foreman $3.00 per hour for hours paid
> 1st Period Trainees $0.00
> 2nd Period Trainees $0.00
> 3rd Period Trainees $1.25 per hour for hours paid
> 4th Period Trainees $1.25 per hour for hours paid

*Id*. at § 6.02 (Welfare Fund).

> All Employers subject to the terms of this Agreement shall contribute an amount equal to 1.5% of gross productive payroll. This sum shall be due the Trust Fund by the same date as is their payment to the N.E.B.F. under the terms of the Employees Benefit Agreement. It is agreed that .5% of this contribution will go to fund the addition to the JATC building and if during the life of this contract the funds for the

13

construction and financing of this addition are reached the total contribution will be reduced to 1%.

*Id*. at § 6.03(a) (Apprenticeship and Training Fund).

It is agreed between the parties hereto that Employers shall comply with all the applicable provisions of the Trust Agreement establishing "The Local Union No. 8, IBEW Retirement Plan and Trust." Effective June 26, 2000 the contribution for Residential Wireman B shall be one dollar and eighty-two cents ($1.82) per hour for hours paid. The contribution for Residential Wireman A and Foreman shall be $2.50 per hour for hours paid.

*Id*. at § 6.04 (Local Union No. 8, IBEW Retirement Fund).

Each individual Employer shall contribute an amount not to exceed one percent (1%) nor less than two tenths of one percent (.2 of 1%) of the productive electrical payroll, as determined by each local chapter and approved by the Trustees, with the following exclusions (emphasis added to original):
1. Twenty-five percent (25%) of all productive electrical payroll in excess of 75,000 man-hours paid for electrical work in any one Chapter area during any one calendar year, but not exceeding 150,000 man-hours.
2. One hundred percent (100%) of all productive electrical payroll in excess of 150,000 man-hours paid for electrical work in any one Chapter area during any one calendar year. (Productive electrical payroll is defined as the total wages ((including overtime)) paid with respect to all hours worked by all classes of electrical labor for which a rate is establishedin the prevailing labor area where the business is transacted.)
Payment shall be forwarded monthly to the National Electrical Industry Fund in a form and manner prescribed by the Trustees no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. Failure to do so will be considered a breach of this Agreement on the part of the individual Employer.

*Id*. at § 6.0 (Industry Fund).

Although the language of these provisions is different from the fringe benefits language of

the Inside CBA, it is clear that an employer performing residential work under the Residential

CBA has an obligation to make fringe benefits payments.

## 2. Repudiation of agreements in 2003

14

NWO claims that it terminated its relationship with TEWF and the Union in June 2003. Jamie testified that he told Roach that NWO was terminating its agreements with the Union, and that Roach stated to Jamie, "I am sorry to hear that, man" and that was the end of the conversation. Jamie Sorosiak July 19, 2006 Depo. at117; August 16, 2006 Depo. at 109.  Roach claims that Jamie never told him he was terminating the Agreements NWO had signed in December 2002. Roach Depo. at 27.  Later, when Jamie received a phone call inquiring as to why NWO had not submitted its fringe benefit contribution report for the July 2003, he responded that he had terminated his agreements with the Union and the June 2003 fringe benefit was the last one NWO would file.  When Jamie submitted his last fringe benefit report, he had checked a box on the face of the fringe benefit report labeled "Final report in this Local Union area." *See* June of 2003 Fringe Benefit Report, Exhibit D.  Jamie did not hear from the Union again until August 2004, when it claimed that NWO was liable for fringe benefits from July 2003 to August 2004.

### a. One man bargaining rule

The one-man bargaining rule provides that an employer that "employs one or fewer unit employees on a permanent basis . . . , without violating Section 8(a)(5) of the [National Labor Relations Act], may withdraw recognition from a union, repudiate its contract with the union, or unilaterally change employees' terms and conditions of employment without affording a union an opportunity to bargain." *Stack Elec.*, 290 N.L.R.B. 575, 577 (1988).  *See also J.W. Peters, Inc. v. Bridge, Structural & Reinforcing Iron Workers, Local Union 1*, 398 F.3d 967, 973 (7th Cir. 2005). "The rule is based on the principle that 'collective bargaining presupposes that there is more than one eligible person who desires to bargain.' *Id.* at 973-74 (quoting *Foreign Car Ctr., Inc.*, 129 N.L.R.B. 319, 320 (1960)).  Without others to represent, collective bargaining is meaningless."

15

*Central States, Southeast and Soutwest Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663, 671 (7th Cir. 2005).

NWO maintains that the one-man bargaining rule applies to allow Jamie to repudiate the agreements, because NWO had laid off Jeremy Harloff, the only bargaining unit employee employed at the time, which left only three unregistered Penta student employees and Mike Lambert (who was not a student, but was not registered with the Union).  TEWF argues that the one-man bargaining rule applies only to labor law cases, not ERISA § 515 actions, relying on the Seventh Circuit's decision in *Central States* and *J.W. Peters*, supra (holding that the rule applied to unfair labor practice cases, but not ERISA cases).  NWO relies on the Ninth Circuit's decision in *Laborers Health & Welfare Trust Fund v. Westlake Dev.*, 53 F.3d 979, 982-84 (9th Cir. 1995) (holding that the rule applied in an ERISA action, and the employer's unilateral repudiation rendered the CBA void, not merely voidable).

The Sixth Circuit has not addressed the applicability of the one-man bargaining rule to an ERISA § 515 action.  The circuit has made an observation or two that guide this Court.  In *Plumbers & Pipefitters Local Union No. 572 Health and Welfare Fund v. A & H Mechanical Contractors, Inc.*, 100 Fed.Appx. 396 (6th Cir. 2004), the employer had entered into a bargaining agreement that required payments on behalf of employees to the fund, but later wrote a letter unilaterally withdrawing from the agreement and ceased payments, whereupon the union obtained a judgment from the Joint Arbitration Committee and filed an ERISA § 515 suit for the unpaid benefits.  The fund argued that the court was bound by the JAC decision, the employer did not properly terminate the agreement, and the termination defense may not be used in an ERISA

16

claim. *Id*. at 399.  The Sixth Circuit disregarded the arbitration decision, and held that the

employer's letter complied with the agreement's termination provision.  The court observed that:

> Because employee benefit plans frequently remain obligated to pay benefits to
> employees even when employers do not make their required contributions, and
> because "anything less may well saddle the plans with unfunded obligations,"
> *Gerber Truck*, 870 F.2d at 1153, Congress has given these plans the upper hand in
> § 515 litigation in order to permit "efficacious[ ]" recovery of "delinquent
> contributions," 126 Cong. Rec. 23,039 (1980) (remarks by Rep. Thompson).
>
> In view of these realities of plan management, courts have permitted defendants in
> these actions to raise only a few discrete "defenses": (1) illegality of the original
> contract; (2) arguments that the contract was void at its inception (e.g., by fraud in
> the execution); and (3) decertification of the union. *See Alfred Miller Gen.
> Masonry*, 157 F.3d at 408; *Agathos*, 977 F.2d at 1505. In addition, employee
> benefit funds "are not entitled to enforce a nonexistent contractual obligation."
> *DeVito v. Hempstead China Shop, Inc*., 38 F.3d 651, 654 (2d Cir.1994) (quotation
> and citation omitted) (emphasis added); *see also Alfred Miller Gen. Masonry*, 157
> F.3d at 409 & n. 12 (stating that a district court may consider "the significance of a
> purported termination" of the collective bargaining agreement in a § 515 action,
> provided the inquiry is "superficial").

*Id*. at 402-03.  The court held that it was permissible for the district court to consider the

employer's termination defense.

> With regard to what extent a district court may consider a termination defense, the court

cited a Fifth Circuit case, which held that:

> Although a district court may consider the significance of a purported termination,
> the court's examination must end following a superficial inquiry into the
> termination's effect. Thus, a court may determine whether an attempted termination
> was timely or not. Cf. *Bla-Delco Constr*., 8 F.3d at 1369. Further, a court may
> review an alleged termination to determine if the requisite intent has been
> conveyed. Cf. *OPEIU, Local 42 v. UAW, Westside Local 174*, 524 F.2d 1316, 1317
> (6th Cir. 1975). However, if the issue of termination cannot be resolved through
> cursory review, the defense to a section 515 action will not succeed.

*Louisiana Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller General*

*Masonry Contracting Co.*, 157 F.3d 404, 409 n.12 (5th Cir. 1998).

17

The defense of the one-man bargaining rule, in the case now before this Court, cannot be resolved through cursory review.  Whether the one-man bargaining rule applies depends on this Court having to determine several other issues, including whether Lambert was a student or whether he should have been considered a Union member or a student (he had switched between taking classes and only working), and whether the Penta students should have been registered with the Union and whether they should have been considered part of the bargaining unit.  The tortured nature of the discovery that took place to sort through these factual issues in the first place demonstrates the complexity of making such an assessment.  The presence of these sub-issues suggests that there is more to the evaluation of the one-man bargaining rule than would qualify as "superficial," especially in light of the lack of authority from the Sixth Circuit on this point.

### b. Letters of Assent

The LOA signed by both parties, provides the following:

> In signing this letter of assent, the undersigned firm does hereby authorize Toledo Chapter, NECA (Toledo Electrical Contractors Association, Inc.) as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent approved residential labor agreement between the Toledo Chapter, NECA (Toledo Electrical Contractors Association, Inc.) and Local Union 8, IBEW. In doing so, the undersigned firm agrees to comply with, and be bound by, all of the provisions contained in said current and subsequent approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective on the 16th day of December, 2002. It shall remain in effect until terminated by the undersigned employer giving written notice to the Toledo Chapter, NECA (Toledo Electrical Contractors Association, Inc.) and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement.

Union Ex. H, I.

18

The LOA does not further specify what form a written notice of termination would take. However, the monthly contribution report form contains the following list with a check box next to each option:

> Check here when:
> First report in this Local Union area
> Final report in this Local Union area
> More forms are needed

NWO Ex. D.  There is also a line that says, "This report is for payroll period ending _____, 20__."  *Id*.  The form filed by NWO on August 4, 2003 indicates the date in that line to be of June 2003.  The box next to "Final report in this Local Union area" is clearly marked.  However, even if this report form can be considered written notification to the Union and TEWF of NWO's intent to terminate the agreements with the Fund, it still fails.  The then-current anniversary of the signing would have been December 16, 2003.  The report was filed a few weeks short of 150 days prior to December 16 of that year.

### c. Termination by conduct

NWO claims that, by not making contributions for over a year before TEWF contacted the Sorosiaks about delinquent contributions, the agreements were repudiated by conduct.  The NLRB has held that, under the NLRA, "when an employer consistently fails to recognize the union or to abide by the terms of a collective-bargaining agreement, the union is put on notice that the employer has repudiated the agreement." *St. Barnabas Medical Center and New Jersey Nurses Union*, 343 N.L.R.B. 1125, 1129 (2004) (citing *Natico, Inc.*, 302 N.L.R.B. 668, 671 (1991) ("The failure to make the payments month after month was itself tantamount to repudiation, and the Union was put on notice of the repudiation by the sheer length of time during which [the respondent employer] consistently failed to make payments.")).  The Eighth Circuit in *Contractors*

19

*Health & Welfare Plan v. Harkins Constr. & Equipment Co.*, 733 F.2d 1321, 1326 (8th Cir. 1984) stated:

> In order to constitute a repudiation, the conduct must be sufficient to put the union and the employees on notice that the agreement is terminated. Whether sufficient notice of termination has been given raises a question of fact that requires an examination of the conduct of all parties. Where the prehire contract itself, as in this case, contains no provision for a formal notice of termination, open and notorious acts by one party, known to the other, which are inconsistent with the continuance of the contract would, in our view, constitute sufficient notice of repudiation. A mere breach of contract ordinarily will not suffice to establish repudiation.

*Id.* (citations omitted). *See also Washington Area Carpenters' Welfare Fund v. Overhead Door Co.*, 681 F.2d 1, 9 n. 38 (D.C. Cir. 1982) ("The essential point is that the union and employees be put on notice that the contract is voided."), *cert. denied*, 461 U.S. 926 (1983); *United Brotherhood of Carpenters & Jointers v. Endicott Enterprises, Inc.*, 806 F.2d 918, 922 (9th Cir. 1986); *Operating Engineers Pension Trust v. Beck Engineering and Surveying Co.*, 746 F.2d 557, 566 (9th Cir. 1984); *NLRB v. Crossroads Elec., Inc.*, 178 Fed.Appx. 528, 535-36 (6th Cir. 2006) (citing *NLRB v. Allied Products Corp., Richard Bros. Div.*, 548 F.2d 644, 650 (6th Cir. 1977) ("This is only a specific application of the general rule that a limitation period begins to run when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged (violation).")

There are two reasons that NWO cannot be held responsible for contributions beyond June 2003. First, TEWF acquiesced in NWO's repudiation of the Residential CBA for a sufficient period of time. Second, NWO was never subject to the renewed Residential CBA in the first place.

### i. Effective repudiation by conduct

Unlike with regard to the one-man bargaining rule, there is no factual dispute or legal dilemma that needs to be resolved here: the parties agree that Jamie Sorosiak indicated his intent to stop abiding by the agreements, and TEWF waited over a year before seeking delinquent payments.  Jamie indicated to Roach that NWO no longer intended to abide by the LOAs and CBAs, checked a box indicating that June 2003 was the final report, told a TEWF caller that NWO no longer intended to be bound by the agreements, and ceased payment of benefits and other compliance with the agreements.  Fourteen months later, at the end of August 2004, Ladd called Jamie, and Jamie again stated his intention no longer to abide by the agreements.  Another four months later, the TEWF filed a grievance against NWO for breach of the agreements.

The defense of repudiation by conduct may be imported from labor law into this ERISA § 515 case because it can be applied through a merely superficial analysis.  Termination was ineffective at the time Jamie Sorosiak gave oral notification of his intent to withdraw.  However, that termination took on a legitimacy of its own over the course of the next at least one year, when TEWF took no action whatsoever to claim or collect any unpaid benefits from NWO.  That lapse by TEWF overcomes the failure of NWO to terminate pursuant to the agreements' provisions.  It was or should have been obvious to TEWF that NWO was violating the contract by not contributing, and TEWF acquiesced in the violation for over a year.  During that time, NWO was not paying benefits to the Fund, and the Fund was not paying out any benefits to NWO employees (indeed, none were even registered with the Union).  The contract may have been bruised at first, but eventually it passed out, and TEWF did nothing to revive it as it laid knocked out for over a year, until the Fund rushed in to make a late attempt to save it, only to leave it sit for another four months afterward.  The Sixth Circuit having previously produced a "paucity of pertinent []

21

precedent" on this particular topic, *Central States, Southeast & Southwest Areas Pension Fund v. General Materials, Inc.*, Nos. 07-1392/1473, 2008 WL 2901700 at *4 (6th Cir. July 30, 2008), this Court applies what is consistent with the Circuit's guidance in this and other areas of law, *see, e.g., NLRB v. Allied*, supra, because it can be resolved by cursory, superficial review, *see, e.g., Plumbers & Pipefitters*, supra, due to the lack of any genuine issue of material fact.

### ii. Expiration of the first Residential CBA

In a slightly different context, the Sixth Circuit has held that language similar to that in the case at bar required the written notice provided therein, and that subsequent agreements were valid when they arose by operation of an automatic renewal clause.

> This circuit has interpreted the standard NECA language involved in this dispute to require written notice of termination at the appropriate time.  In other words, in the absence of a written termination one hundred fifty days before the current agreement's anniversary date, NECA retains the authority to bind a signatory to subsequent collective bargaining agreements. . . . The Company never supplied proper written notice of termination and was therefore bound by the collective bargaining agreement in effect at the time it hired workers other than from the hiring hall.

*R.L. Reisinger Co., Inc. v. NLRB*, 1994 U.S. App. LEXIS 36160 at *8-9 (6th Cir. 1994).  *See also Central States Pension Fund v. Behnke*, 883 F.2d 454 (6th Cir. 1989).  In *Behnke*, a similar issue arose in the context of participation agreements (similar to LOAs) and renewing CBAs.  The court extended the application of the CBA into a new term, effectively renewing the CBA after it had expired on its own terms.

However, in a more recent case, the circuit distinguished *Behnke*, saying that *Behnke* turned on the facts that the employer had entered into a new participation agreement during the negotiation period for a new CBA, and the CBA was not necessarily tied to the participation agreement.  In *General Materials*, 2008 WL 2901700 at *3, the Sixth Circuit disagreed with the

22

employer's argument that *Behnke* authorized federal courts to enforce contractual obligations to contribute based on independent, unexpired participation agreements that extend on their own terms beyond the expiration of a CBA.  The court held that, where the employer is not a part of negotiations for a new CBA after the one to which it is signatory (by operation of a participation agreement) expires, and the participation agreement was signed contemporaneously with and totally dependent on the expiring CBA, the participation agreement does not subject the employer to a new CBA.  *Id.* at 3-4.  That holding was in spite of language that the first CBA would "continue in full force and effect from year to year thereafter unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other at least sixty (60) days prior to the date of expiration."  *Id* at 1.  The employer sent a letter of termination to the union (not the fund) in October of 1993.  *Id.*  Nevertheless, the court held that the employer's obligation had ended contractually in December of 1993, with the expiration of the first of the CBA.

The *General Materials* court considered the conduct of the parties in order to determine whether the CBA remained valid, and approved the trial court's conclusion that the conduct of the parties suggested that the CBA was terminated.  The trial court considered the way that the employer, the union, and the funds had conducted themselves during the relevant time period, and determined that their conduct evidenced that the CBA was not in effect after 1993.  *General Materials, Inc.* No. 04-73593, 2007 WL 496696 (E.D. Mich. Feb. 12, 2007).  The trial court found that the following conduct evidenced that the CBA was terminated: General had hired non-union employees after the expiration of the CBA and never made contributions to the funds for them; General never withheld dues or benefits for any new employee; and General never hired a union steward.  *Id.* at *4.  The trial court found that the conduct of the fund as well as General in

23

accepting contributions for only two employees and questioning contributions for no others until a lawsuit was filed, supported the conclusion that an understanding existed between the parties that the 1991 CBA did not remain in full force or effect by way of the 1991 participation agreement. *Id.*

This case is more similar to *General Materials* than to *Behnke*.  NWO did not participate in the negotiation of the new CBA -- in fact, NWO considered itself withdrawn from the agreements completely by late June of 2003.  While the employer in *Behnke* was involved during the negotiation period, NWO was seeking to exclude itself completely during the May-June 2003 period between the two Residential CBAs.  Like in *General Materials*, the LOA and the first Residential CBA are explicitly intertwined and reliant on one another.  No LOA was signed in June 2003, when the second Residential CBA took effect.  As such, NWO's obligations under the first Residential CBA ended when it expired on May 23, 2003.  NWO was never properly subject to the June 23, 2003 Residential CBA.

### 3. Arbitration award

Generally, a court must give the decisions of arbitrators a high degree of deference with regard to the merits of the matter, *United Steel Workers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593 (1960), playing a limited role when a losing party asks the court to vacate an award, *United Paper Workers International Union v. Misco, Inc.*, 484 U.S. 29, 31 (1987).  Federal courts shall ensure that a challenged arbitration award grew out of a legitimate process, that the prevailing party did not obtain the decision through fraud, that the arbitrator did not suffer from a conflict of interest or exercise dishonesty, and that the arbitration award did not merely reflect the arbitrator's own notion of industrial justice.  *Michigan Family Resources, Inc. v. Service*

24

*Employees International Union Local 517M*, 475 F.3d 746, 752 (6th Cir. 2007).  A permissible award is one that "draws its essence from the contract" and an impermissible award is one that "simply reflect[s] the arbitrator's own notion[] of industrial justice."  *Id.* (citing *Misco*, 484 U.S. at 38, and *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)).  The inquiry is "based on whether 'the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority.'"  *Id.*  The Circuit, sitting en banc, framed a court's inquiry and identified the parameters of that approach as follows:

> [The court] will consider the questions of "procedural aberration" that *Misco* and *Garvey* identify.  *Misco*, 484 U.S. at 40 n. 10, 108 S.Ct. 364.  Did the arbitrator act "outside his authority" by resolving a dispute not committed to arbitration?  Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award?  And in resolving any legal or factual disputes in the case, was the arbitrator "arguably construing or applying the contract"?  So long as the arbitrator does not offend any of these requirements, the request for judicial intervention should be resisted even though the arbitrator made "serious," "improvident" or "silly" errors in resolving the merits of the dispute.

*Michigan Family Resources*, 475 F.3d at 753 (Sutton, J., writing for en banc court).

In this case, for reasons discussed above, NWO was not a party to the new Residential CBA that was entered into on June 23, 2003, and was not subject to the obligations thereunder.  As such, the award did not draw its essence from an applicable agreement.  Any award based on the previous Residential CBA would only be retroactive to any time before June 2003.  There were other defects with the arbitration process as well.  First, the same individuals who filed the grievance also served as witnesses at the arbitration and served on the panel arbitrating the grievance.  As such, there was a lack of impartiality in the decision-making process that the Union and TEWF have not shown can be overcome.  Additionally, the arbitrators came up with estimates of how much time was spent by how many employees and at how many projects in order to

25

estimate the amount of contributions NWO owed and for which NWO would be liable. There was no basis for these estimates in the CBA, and the estimates were not based on any real measure of NWO's work, number of employees, or earnings. The Union has not produced evidence to the contrary.

For these reasons, and those discussed throughout this opinion, the arbitration award is hereby vacated, consistent with this opinion.

### 4. Fraud and punitive damages

NWO has argued that, if it is found to owe fringe benefits prior to June 2003, Third-Party Defendant Union should be held liable because it allegedly engaged in fraud in the execution, fraud in the inducement, fraudulent misrepresentation, or negligent representation. Doc. 160 at 62. The Court declines to address these allegations against the Union. Because the Court herein finds that NWO is not liable for contributions prior to June 2003, the Court need not address these arguments made in the alternative.

Neither does the Court find appropriate NWO's request for punitive damages against the Union defendants. The damages in this case remain unestablished, and in any event, not great; there is a lack of "reprehensible" conduct by the Union defendants; and the harm suffered by NWO has not been established to be sufficient for punitive damages. *See BMW v. Gore*, 517 U.S. 559 (1996); *State Farm Mutual Auto Ins. v. Campbell*, 538 U.S. 408 (2003).

### B. Piercing the corporate veil

The Fund urges that this Court agree to pierce the corporate veil of NWO and KSB to hold both corporations and Jamie and Kelly Sorosiak liable for unpaid fringe benefit contributions. Because this Court holds that NWO was not obligated to make, nor TEWF obligated to receive or

26

collect, contributions beyond June 2003, the Court need not address the issues of piercing the corporate veil and personal liability.

**V. Conclusion**

      For the reasons discussed herein: NWO's motion for summary judgment (Doc. 160) is hereby granted in part and denied in part, to the extent discussed in this opinion; the TEWF's motion for summary judgment (Doc. 162) is hereby denied, consistent with this opinion; and the Union's motion for summary judgment (Doc. 156) is hereby granted in part and denied in part, consistent with this opinion.

      IT IS SO ORDERED.

                 _s/ David A. Katz_
                DAVID A. KATZ
                U. S. DISTRICT JUDGE

27